Cecillia D. Wang (admitted *pro hac vice*)
Andre I. Segura (admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA  94111
Telephone:  (415) 343-0775
Facsimile:  (415) 395-0950
Email: cwang@aclu.org
      asegura@aclu.org

Attorneys for Plaintiffs
*Additional counsel listed on following page

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| ANGEL LOPEZ-VALENZUELA and ISAAC CASTRO-ARMENTA, <br><br>                Plaintiffs, <br><br>       v. <br><br> MARICOPA COUNTY; JOSEPH ARPAIO, Maricopa County Sheriff, in his official capacity; and RICHARD ROMLEY, Maricopa County Attorney, in his official capacity, <br><br>                Defendants. | No. CV 08-660-PHX-SRB (ECV) <br><br> CLASS ACTION <br><br> **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> <u>**ORAL ARGUMENT REQUESTED**</u> <br><br> Judge:  Hon. Susan R. Bolton |

1

<u>Additional counsel:</u>

2

Gladys Limon (admitted *pro hac vice*)

3
MEXICAN AMERICAN LEGAL
   DEFENSE AND EDUCATIONAL FUND

4
634 S. Spring Street, 11th Floor
Los Angeles, CA  90014

5
Telephone: (213) 629-2512
Facsimile: (213) 629-0266

6
Email:  glimon@maldef.org

7
Daniel Pochoda, Bar No. 021979
Anne Lai, Bar No. 330036*

8
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235

9
Phoenix, AZ 85014
Telephone:  (602) 650-1854

10
Facsimile:  (602) 650-1376
Email: dpochoda@acluaz.org

11
* Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

12
Tanaz Moghadam (admitted *pro hac vice*)
ACLU FOUNDATION

13
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street

14
New York, NY  10004-2400
Telephone:  (212) 549-2660

15
Facsimile:  (212) 549-2654
Email: tmoghadam@aclu.org

16

Lee David Stein, Bar No. 012368

17
Steven J. Monde, Bar No. 024076
PERKINS COIE BROWN & BAIN P.A.

18
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012-2788

19
Telephone:  (602) 351-8000
Facsimile:   (602) 648-7000

20
Email:  SMonde@perkinscoie.com

21
David J. Bodney, Bar No. 006065
Kevin B. Wein, Bar No. 022752

22
STEPTOE & JOHNSON LLP
Collier Center

23
201 East Washington Street, Suite 1600
Phoenix, AZ  85004-2382

24
Telephone:  (602) 257-5200
Facsimile:   (602) 257-5299

25
Email:         DBodney@steptoe.com

26

1

# TABLE OF CONTENTS

2  TABLE OF AUTHORITIES ..................................................................................... iii

3  INTRODUCTION ................................................................................................... 1

4  SUMMARY OF UNDISPUTED FACTS ............................................................... 2

5  SUMMARY JUDGMENT STANDARD ................................................................ 4

6  ARGUMENT ........................................................................................................... 4

7      I.     PROPOSITION 100 VIOLATES THE DUE PROCESS
8             CLAUSE ................................................................................................. 5

9             A. Proposition 100 Has the Impermissible Purpose of
                 Inflicting Punishment for Immigration Violations and
10                Deterring Future Violations ............................................................... 7

11            B. Proposition 100 Violates Due Process Because It Is
                 Excessive in Relation to Any Legitimate Purpose for
12                Pretrial Detention .............................................................................. 10

13
                  1. Proposition 100 Is Excessive in Relation to Any
14                     Legitimate Purpose Because It Imposes a Categorical
                       Prohibition on Bail and Requires Courts to Ignore
15                     Factors of Flight Risk and Danger to the Community ................... 10

16                2. Proposition 100 Is Excessive Because the Legislature
                       Made No Findings to Demonstrate that It Was Needed
17                     To Address a Legitimate Purpose ..................................................... 13

18                3. Proposition 100 Is Excessive Because it Applies in Cases with
                       Admittedly Minor Charged Offenses ............................................... 15
19
              C. Proposition 100 Violates Due Process Because It Lacks
20               Minimally Adequate Procedural Protections as Required
                 by *Salerno* .......................................................................................... 17
21
       II.   PROPOSITION 100 VIOLATES THE EIGHTH
22            AMENDMENT'S EXCESSIVE BAIL CLAUSE ..................................... 19

23     III.  MARICOPA COUNTY'S POLICY TO PROHIBIT
              APPOINTED COUNSEL AT THE INITIAL APPEARANCE
24            VIOLATES THE SIXTH AMENDMENT RIGHT TO
              COUNSEL ............................................................................................... 20
25

26

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

A.  Proposition 100 IAs Are a Critical Stage Because They
    Entail a Substantial Risk of Prejudice Without Assistance
    of Counsel ........................................................................................... 21

B.  Defendants Need Counsel to Understand the
    Confrontational Nature of the Proposition 100 IA ............................... 22

C.  The Proposition 100 Initial Appearance Is Also A Critical
    Stage Because It May Reach the Merits of the Case ............................. 23

CONCLUSION ........................................................................................................... 25

1

**TABLE OF AUTHORITIES**

2

**Federal Cases**

3    *Augustus v. Roemer*, 771 F. Supp. 1458 (E.D. La. 1991), .......................................... 13, 19

4    *Bell v. Wolfish*, 441 U.S. 520 (1979).................................................................... 5, 7, 9

5    *Brewer v. Williams*, 430 U.S. 387 (1977)..................................................................... 20

6    *Brinegar v. United States*, 338 U.S. 160 (1949)............................................................. 18

7    *Brock v. Pierce County*, 476 U.S. 253 (1986);................................................................ 7

8    *Castro-O'Ryan v. INS*, 847 F.2d 1307 (9th Cir. 1987) ..................................................... 23

9    *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).................................................................. 4

10    *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188 (2003) ................. 7

11    *City of Los Angeles v. County of Kern*, 509 F. Supp. 2d 865 (C.D. Cal. 2007) ............... 10

12    *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692 (9th Cir. 1997)......................................... 9

13    *Coleman v. Alabama* 399 U.S. 1 (1970)........................................................................ 22

14    *Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004) ........................................................... 9

15    *Demore v. Kim*, 538 U.S. 510 (2003) ........................................................................... 6

16    *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285 (9th Cir. 1987) ........................................ 4

17    *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976)................................... 7

18    *Foucha v. Louisiana*, 504 U.S. 71 (1992). ................................................................... 5, 6

19    *Galen v. County of Los Angeles*, 477 F.3d 652 (9th Cir. 2007). ...................................... 19

20    *Gerstein v. Pugh*, 420 U.S. 103 (1975) ....................................................................... 18

21    *Guggenheim v. City of Goleta*, 582 F.3d 996 (9th Cir. 2009) ........................................... 7

22    *Higazy v. Templeton, 505 F.3d 161 (2d Cir. 2007)*....................................................... 22, 24

23    *Hovey v. Ayers,* 458 F.3d 892 (9th Cir. 2006)............................................................... 21

24    *Hunt v. Roth,*   648 F.2d 1148 (8th Cir. 1981), *vacated as moot sub nom.*

25       *Murphy v. Hunt*, 455 U.S. 478 (1982)................................................................... 12, 13

26

*Jones v. Bates, 127 F.3d 839 (9th Cir. 1997), rev'd sub nom. Bates v. Jones*,
   131 F.3d 843 (9th Cir. 1997) ................................................................... 9, 10

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) ...................................... 5, 9

*Massiah v. United States*, 377 U.S. 201 (1964) ................................................ 24

*Murphy v. Hunt*, 455 U.S. 478 (1982) ............................................................... 12

*Nadarajah v. Gonzales*, 443 F.3d 1069 (9th Cir. 2006) ..................................... 6

*Padilla v. Kentucky*, 130 S. Ct. 1473, 1483 (2010) .......................................... 17

*Reno v. Flores*, 507 U.S. 292, 301-02 (1993) ...................................................... 5

*Rothgery v. Gillespie County*, 128 S.Ct. 2578 (2008) ................................. 20, 23

*Sable Communications v. FCC*, 492 U.S. 115 (1989) ........................................ 14

*Schall v. Martin*, 467 U.S. 253 (1984) ............................................ 5, 7, 10, 11, 12

*Stack v. Boyle*, 342 U.S. 1 (1951) ...................................................................... 19

*United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004). .............................. 24

*United States v. Bohn*, 890 F.2d 1079 (9th Cir. 1989) ................................ 21, 24

*United States v. Johnson*, 516 F. Supp. 696 (E.D. Pa. 1981), *aff'd*, 709 F.2d
   1496 (3d Cir. 1983) .................................................................................. 22, 24

*United States v. Leonti*, 326 F.3d 1111 (9th Cir. 2003) .................................... 21

*United States v. Melanson*, 691 F.2d 579 (1st Cir. 1981) ................................ 24

*United States v. Moore*, 607 F. Supp. 489 (N.D. Cal. 1985)............................ 19

*United States v. Perez*, 776 F.2d 797 (9th Cir. 1985), *overruled on other
   grounds by United States v. Cabaccang*, 332 F.3d 622 (9th Cir. 2003) ...... 22

*United States v. Portes*, 786 F.2d 758 (7th Cir. 1985) ..................................... 19

*United States v. Salerno*, 481 U.S. 739 (1987)............................. 5, 6, 7, 11, 14, 17, 18, 19

*United States v. Scott*, 450 F.3d 863 (9th Cir. 2006)........................................ 11

*United States v. Wade*, 388 U.S. 225 (1967). ...................................... 20, 23, 25

*Valeria v. Davis*, 307 F.3d 1036 (9th Cir. 2002).......................................... 9, 10

*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005) ..................................... 15

*Yohn v. Love*, 76 F.3d 508 (3d Cir. 1996) ......................................................... 24

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ..................................................... 6, 17


## State Cases

*Hernandez v. Lynch*, 167 P.3d 1264 (Ariz. Ct. App. 2008) ................................. 6

*Huihui v. Shimoda*, 644 P.2d 968 (Haw. 1982) ................................................ 13

*Scott v. Ryan*, 548 P.2d 235 (Utah 1976) ........................................................ 12

*Segura v. Cunanan*, 196 P.3d 831 (Ariz. Ct. App. 2008) ............................. 18, 20

*Simpson v. Owens*, 85 P.3d 478 (Ariz. Ct. App. 2004) ............................... 12, 23

*State v. Arthur*, 390 So. 2d 717 (Fla. 1980); ................................................... 12

*In re West*, 88 N.W. 88 (N.D. 1901) .............................................................. 12


## Federal Statutes

18 U.S.C. § 3142(e) ........................................................................................ 11

18 U.S.C. § 3142(f) ........................................................................................ 18

Fed. R. Civ. P. 56(c) ........................................................................................ 4


## Legislative History

S. Rep. No. 98-225 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182 .............................. 14


## State Constitutional Provisions and Statutes

A.R.S. § 13-1602(B)(1)-(2) ....................................................................... 3, 16

A.R.S. § 13-1604(B)(1)(a)-(b) ................................................................... 3, 16

A.R.S. § 13-1805(H)-(I). ......................................................................... 3, 16

A.R.S. § 13-3961(A)(5) ................................................................................ 3

A.R.S. § 13-3961(A)(5)(b) ........................................................................... 2, 16

A.R.S. § 13-3967 ........................................................................................... 15

A.R.S. § 13-706(F)(1) .................................................................................. 3, 16

Ariz. Const. art. II § 22(A)(4) ..................................................................... 2, 15

Ariz. Const. art. II, § 22(A) ............................................................................ 3

H.B. 2389, 47th Leg., 1st Reg. Sess. (Ariz. 2005) ......................................... 2

H.B. 2580, 47th Leg., 2d Reg. Sess. (Ariz. 2006) ......................................... 2

S.B. 1265, 48th Leg., 1st Reg. Sess. (Ariz. 2007) ......................................... 3

**INTRODUCTION**

Plaintiffs and the certified class challenge Proposition 100, an Arizona constitutional provision that categorically forbids judges to set bail when there is probable cause to believe that the defendant "entered or remained in the United States illegally" and there is sufficient proof that he has committed any one of a wide range of criminal offenses under Arizona law.  Proposition 100 is unprecedented in American law.  It eliminates the Arizona courts' core judicial role of making an individualized bail assessment.  It renders an exceedingly broad class of defendants categorically ineligible for bail based solely on their putative immigration status, even in cases involving minor charges such as shoplifting.  Before Proposition 100, Arizona courts could hold a defendant without bail based upon the facts of the case and could consider immigration status when warranted.  Proposition 100 did nothing to broaden judicial authority to detain when appropriate; it simply requires that defendants who do *not* pose a flight risk will be needlessly jailed pending trial.

Proposition 100 violates the Due Process Clause and the Eighth Amendment's excessive bail clause and is unconstitutional on its face.  Its purpose is to punish violations of immigration law and to deter illegal immigration.  The Constitution forbids such punitive purposes for pretrial detention.  Even setting aside its punitive nature, Proposition 100 also violates due process because it is excessive in relation to any legitimate purpose. The statutory procedures and practices implementing Proposition 100 also fall short of due process standards.  In addition, Maricopa County's post-Proposition 100 policy of forbidding appointed counsel for indigent defendants at initial appearances independently violates the Sixth Amendment right to counsel.

Plaintiffs therefore move for summary judgment on their Due Process Clause and Eighth Amendment challenges to Proposition 100 and, in the alternative, their Sixth

1   Amendment challenge to Defendant Maricopa County's post-Proposition 100 policy of

2   forbidding appointed counsel for indigent defendants at initial appearances.[1]

3                        **SUMMARY OF UNDISPUTED FACTS**

4        In November 2006, the Arizona legislature proposed and the voters passed

5   Proposition 100, a referendum amending the state constitution to prohibit pretrial release

6        [f]or serious felony offenses as prescribed by the legislature if the person
         charged has entered or remained in the United States illegally and if the
7        proof is evident or the presumption great as to the present charge.

8   Ariz. Const. art. II, § 22(A)(4).  *See also* H.B. 2389, 47th Leg., 1st Reg. Sess. (Ariz.

9   2005); Plaintiffs' Statement of Facts in Support of Motion for Summary Judgment

10  ("SOF") 1-4, 7, 11.  Proposition 100 was intended by the Arizona legislature to impose

11  jail time as a punishment for immigration violations and to deter future illegal

12  immigration into Arizona.  SOF 12-17.  According to its drafter, Proposition 100's

13  purpose was to detain undocumented immigrants as a punishment for illegal border

14  crossings.  SOF 12, 13, 15, 16, 18-20.  Other legislators similarly voiced their intent to

15  impose punishment on unauthorized immigrants.  SOF 17.  Through the official voter

16  pamphlet and contemporaneous media coverage, voters were informed that Proposition

17  100 was a law designed to punish and to deter illegal immigration.  SOF 43-47.

18       In submitting Proposition 100 to the voters, the legislature failed to define the term

19  "serious felony offense."  SOF 5, 6.  Notably, the official voter pamphlet on Proposition

20  100 contained statements suggesting that Proposition 100 would target violent offenses.

21  SOF 42.  But the actual definition was far broader, covering any Class 1, 2, 3 or 4 felony

22  and aggravated DUI.  SOF 8, 10; *see* A.R.S. § 13-3961(A)(5)(b); H.B. 2580, 47th Leg., 2d

23  Reg. Sess. (Ariz. 2006).  That definition of "serious felony offense" encompasses many

24  _____

25       [1] Plaintiffs reserve their other claims for trial as the facts relating to those claims

26  may be disputed.  Plaintiffs also reserve their Supremacy Clause claim, which the Court
    dismissed on Defendants' Rule 12(b)(6) motion, for appeal.

1    relatively minor and non-violent offenses such as shoplifting and vandalism.  A.R.S. §§

2    13-1602(B)(1)-(2), 13-1604(B)(1)(a)-(b), 13-1805(H)-(I).  The legislature's definition of

3    "serious felony offense" also was far broader than the Arizona criminal code's existing

4    definition of "serious offense," which is limited to heinous crimes such as murder,

5    aggravated assault, sexual assault of a minor, armed robbery, first degree burglary, and

6    child prostitution.  A.R.S. § 13-706(F)(1); SOF 53.

7         Proposition 100 and its implementing statutes ("the Proposition 100 laws")

8    drastically expanded the circumstances in which bail is prohibited.  Previously, Arizona

9    forbade bail only in cases charging the most serious violent offenses (a capital offense,

10   sexual assault, or specific sexual offenses against children), or for defendants with a

11   demonstrated history of re-offending while on bail or who were found by a judge to pose

12   such a great risk that no conditions could reasonably assure public safety.  Ariz. Const.

13   art. II, § 22(A) (2005).  Yet despite the unprecedented and extreme nature of Proposition

14   100, the legislature failed to make any findings that it was needed.  SOF 32-34, 26, 27.

15        After Proposition 100 went into effect, the Arizona legislature passed Senate Bill

16   1265, which lessened the burden of proof that triggers the no-bail provision and further

17   exacerbated its constitutional failings.  S.B. 1265, 48th Leg., 1st Reg. Sess. (Ariz. 2007).

18   The amendment, enacted after courts held prosecutors to a "proof evident, presumption

19   great" standard, adopted a lower probable cause standard for the finding on immigration

20   status.  *See* A.R.S. § 13-3961(A)(5); SOF 59, 60.

21        After Proposition 100, the Maricopa County Attorney's Office ("MCAO") adopted

22   a policy requiring prosecutors to cover initial appearances to argue for nonbondability.

23   SOF 79.  The head of Maricopa County indigent defense services also determined that

24   Proposition 100 worked such a change in the nature of initial appearances that appointed

25   counsel was necessary.   SOF 73.   But after then-County Attorney Andrew Thomas

26   intervened, Maricopa County countermanded the decision of its indigent defense services

3

1    director and forbade the appearance of appointed counsel at initial appearances.  SOF 74,

2    75, 77.  At the same time, MCAO has continued to be present at initial appearances.  Until

3    July 2009, MCAO sent a prosecutor to every initial appearance and since then,

4    prosecutors have been available for all initial appearances and appear to make arguments

5    when deemed appropriate.  SOF 80.  Prior to Proposition 100, neither defense counsel nor

6    prosecutors appeared regularly at initial appearances.  SOF 81.

7                              **SUMMARY JUDGMENT STANDARD**

8         Summary judgment is properly granted when:  (1) no genuine issues of material

9    fact remain; and (2) after viewing the evidence most favorably to the non-moving party,

10   the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex*

11   *Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d

12   1285, 1288-89 (9th Cir. 1987).

13                                        **ARGUMENT**

14        Proposition 100 imposes pretrial detention as a punishment for federal immigration

15   violations and therefore violates due process and the Eighth Amendment's excessive bail

16   clause.  Even if Proposition 100 were not punitive, its categorical prohibition on bail is

17   excessive in relation to any legitimate purpose of pretrial detention, *i.e.*, addressing flight

18   risk or danger to the community.  In addition, Proposition 100 lacks the procedural

19   protections required of bail laws under the Due Process Clause.  The Court therefore

20   should grant summary judgment for Plaintiffs and enjoin Proposition 100, as there is no

21   genuine issue as to any material fact and Plaintiffs should prevail as a matter of law.

22        In the event that the Court denies summary judgment on the Due Process and

23   Eighth Amendment claims, the Court should grant summary judgment for Plaintiffs on

24   their Sixth Amendment claim against Defendant Maricopa County's post-Proposition 100

25   policy and practice of refusing to provide appointed counsel at initial appearances.

26

I.      **PROPOSITION 100 VIOLATES THE DUE PROCESS CLAUSE**

In *United States v. Salerno*, 481 U.S. 739, 746-47 (1987), the Supreme Court established the framework for determining the constitutionality of pretrial detention statutes.  *Salerno* emphasizes a core due process principle:  "In our society, liberty is the norm, and detention prior to trial . . . is the carefully limited exception."  *Id.* at 755.  And it re-affirmed the longstanding principle that criminal pretrial detention may not be used to impose "punishment before trial." *Id.* at 746-48; *Schall v. Martin*, 467 U.S. 253, 269 (1984); *Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979).  The constitutionally permissible purposes of pretrial detention (or bail conditions) are to ensure the defendant's appearance for trial or, under limited circumstances, to safeguard against the commission of new crimes before trial.  Because they implicate the most fundamental liberty interests, bail laws are subject to strict scrutiny and must be "carefully limit[ed]" to serve a "legitimate and compelling" governmental interest.  *Salerno*, 481 U.S. at 749-52; *cf. also Reno v. Flores*, 507 U.S. 292, 301-02 (1993); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

*Salerno* sets forth this due process test in the specific context of bail statutes.  First, if a bail statute imposes punishment, it is unconstitutional.  *Salerno*, 481 U.S. at 746-48 (citing *Bell*, 441 U.S. at 535, 537 n.16).  Second, if the legislature did not have an express intent to impose punishment, "the punitive/regulatory distinction turns on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Salerno*, 481 U.S. at 747 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963) ) (internal quotation marks omitted).  Thus, even if the legislature did not express a punitive intent, a bail statute violates due process if it is excessive in relation to the legitimate goals of addressing flight risk or danger to the community.

Applying these tests, *Salerno* upheld the federal Bail Reform Act against a due process challenge because it "carefully limited the circumstances under which detention

could be sought [by prosecutors] to those involving *the most serious of crimes* (crimes of violence, offenses punishable by life imprisonment or death, serious drug offenses, or certain repeat offenders) . . . and was narrowly focused on a particularly acute problem in which the government interests are overwhelming." *Foucha*, 504 U.S at 81 (describing *Salerno*) (emphasis added and citations omitted). Moreover, *Salerno* upheld the federal bail statute because it provided for rigorous procedural protections, such as availability of defense counsel at a "full-blown adversary hearing" where the prosecution would have to demonstrate by "clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." 481 U.S. at 750 (citations omitted).

Proposition 100 fails all of *Salerno*'s due process tests.[2] First, the effect and purpose of Proposition 100 is to jail defendants as a punishment for past immigration violations, rather than to ensure their appearance at trial. SOF 14. Second, even if Proposition 100 had a legitimate purpose of ensuring appearance at trial, it would fail *Salerno*'s alternative test because it is excessive in relation to that goal and requires judges

---

[2] Although an Arizona appeals court has held that Proposition 100 does not violate due process, it relied on an erroneous interpretation of federal law and did not properly apply *Salerno*, the controlling precedent. *Hernandez v. Lynch*, 167 P.3d 1264, 1270-75 (Ariz. Ct. App. 2008). This Court owes no deference to the state court's decision on a federal constitutional question and should reject its reasoning. The state court made a fundamental error in relying upon two U.S. Supreme Court opinions, *Zadvydas v. Davis*, 533 U.S. 678 (2001) and *Demore v. Kim*, 538 U.S. 510 (2003). *Id.* at 1271, 1274. Those opinions are inapposite as they do not concern state criminal pretrial detention, but rather address federal administrative detention, which serves a different purpose and raises distinct constitutional issues. Indeed, *Demore* and *Zadvydas* demonstrate that even the federal government could not use *criminal* pretrial detention to facilitate the *administrative* removal process. Both decisions emphasize that the Due Process Clause limits the administrative detention of non-citizens to the "brief period necessary for . . . removal proceedings." *Demore*, 538 U.S. at 513; *see also Zadvydas*, 533 U.S. at 690; *Nadarajah v. Gonzales*, 443 F.3d 1069, 1076-77 (9th Cir. 2006). Thus, for a non-citizen facing state criminal prosecution, who has not yet even been placed in removal proceedings by the federal government, the administrative detention provisions at issue in *Demore* and *Zadvydas* cannot justify pretrial detention in the criminal case.

to *ignore* individualized factors going directly to flight risk or dangerousness.  Proposition 100 was passed without any evidence that undocumented immigrants categorically pose such a great flight risk or danger to the community that a blanket ban on bail is necessary.  SOF 24, 26, 32-35.  And third, Proposition 100 violates due process because it imposes pretrial detention without adequate procedural protections.   Because Proposition 100 categorically forbids state courts to make individualized bail determinations, there is no set of circumstances under which Proposition 100 would be valid and it must be struck down.  *See Guggenheim v. City of Goleta*, 582 F.3d 996, 1014 (9th Cir. 2009) (citing *Salerno*, 481 U.S. at 745) (setting forth standard for facial challenges to statutes).

### A.    Proposition 100 Has the Impermissible Purpose of Inflicting Punishment for Immigration Violations and Deterring Future Violations

On its face, Proposition 100 prohibits pretrial release of any kind for the entire category of persons who have been charged with a Class 1 through 4 felony or aggravated DUI and who "have entered or remained in the United States illegally."  Proposition 100 requires jailing such defendants based solely on their past conduct, regardless of the nature of the criminal charge and the court's individualized findings on bailworthiness.  That constitutes impermissible punishment under *Salerno*.  *See Salerno*, 481 U.S. at 746 (prohibiting "punishment before trial"); *Schall*, 467 U.S at 269; *Bell* 441 U.S. at 535 n.16.

Proposition 100's punitive nature becomes even clearer in light of its legislative history.  Under *Salerno*, the Court "first look[s] to legislative intent" to determine whether a bail law is punitive.[3]  481 U.S. at 747 (citing *Schall*, 467 U.S. at 269).  According to

_____

[3] Although Proposition 100 was passed by voter referendum, it was drafted and submitted to the ballot by the Arizona legislature.  SOF 1-4, 7.  The Court therefore should look to the legislative record in determining intent.  *See City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196-97 (2003).  Statements made by the sponsor or author of a law carry particular weight in establishing legislative intent.  *Brock v. Pierce County*, 476 U.S. 253, 263 (1986); *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976).

1   Proposition 100's drafter and chief sponsor, then-Representative Russell Pearce, the
2   purpose of Proposition 100 was to "find[] and detain[] all persons who are here illegally"
3   as a punishment for illegal border crossings and violations of federal laws prohibiting
4   illegal entry into the United States.  SOF 12, 13, 15, 16.  Pearce expressly stated that
5   criminal defendants who have violated immigration laws should be treated on "a different
6   level than folks who commit crimes."  SOF 18.  During a Judiciary Committee meeting,
7   he explained that Proposition 100 "simply bridges the gap, a loophole in the law that
8   would allow people who are not in this country illegally [sic] who have no business to be
9   released if they commit any crime, they have no business being released if they commit no
10  crime, no additional crime, cause [sic] they're already in the country illegally . . . ." SOF
11  20.  He further stated that Proposition 100 would target unauthorized immigrants who "are
12  violating our sovereignty and shouldn't be here in the first place."  SOF 18.  Proposition
13  100 was intended to punish immigration violations, regardless of whether the detainee has
14  committed a minor offense or indeed, no crime at all.  SOF 52.

15      Other legislators also expressed a punitive intent.  During committee hearings, one
16  legislator observed that Proposition 100 was needed because "a crime has already been
17  committed due to the fact the undocumented person is in the country illegally," and
18  pretrial detention should be imposed as a punishment.  SOF 17.  Another legislator stated,
19  "[W]hat part of illegal don't we understand?  Illegal aliens shouldn't be able to get bond
20  for anything . . . ."  *Id.*  One representative explained his vote for Proposition 100:  "I'm
21  amazed that we provide bail to anybody who's arrested for a crime that is an illegal alien.
22  I think anybody, regardless if it's serious or a minor crime should be denied bail . . . .  I
23  therefore support this bill as a first step to what we should be really doing and that's
24  deporting anybody here illegally."  *Id.*

25      Proposition 100 was also intended to deter future violations of immigration laws.
26  Proponents stated that it would address the federal government's "gross negligence in

8

1    enforcing our borders and securing this nation from an invasion," SOF 19, and would end

2    a purported federal policy to "catch and release" undocumented immigrants, SOF 16.

3    They also intended that Proposition 100 would "combat illegal immigration" and serve as

4    a "de facto deportation tool." SOF 17, 21.  Deterrence of future violations of immigration

5    law is an impermissible punitive purpose for pretrial detention.  *See Kennedy*, 372 U.S. at

6    168-69; *Bell*, 441 U.S at 538-39; *Demery v. Arpaio*, 378 F.3d 1020, 1031 (9th Cir. 2004)

7    ("deterrence does not qualify as a nonpunitive goal with regard to pretrial detainees").

8        Voters also understood that Proposition 100 was designed to punish and to deter

9    illegal immigration.  SOF 42-46.  In determining the voters' intent, the Court may look to

10   the official ballot pamphlet.  *Cf. Valeria v. Davis*, 307 F.3d 1036, 1041 n.8 (9th Cir.

11   2002); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 696-98 (9th Cir. 1997).  The

12   official voter information guide contained numerous statements of punitive intent, SOF

13   42-44, including a statement by the legislative sponsor that Proposition 100 would keep

14   "violent criminals" and "dangerous thugs in jail," SOF 42.[4]  Another proponent argued

15   that Proposition 100 would "protect and defend Arizonans from the illegal invasion" and

16   two proponents referred to Proposition 100 as "secur[ing] our borders."  SOF 43.

17       Pre-election media coverage also broadcast to voters that Proposition 100 would

18   punish illegal immigrants.  SOF 45, 46.  One commentator described Proposition 100 on

19   television as one of several "tough anti-illegal alien ordinances" that would "crack down

20   _____

21       [4]  This statement mischaracterized the actual effect of Proposition 100 by
     suggesting that it would apply only to violent criminals when it actually reached relatively

22   minor crimes. *See infra* Part I(B)(3).  Since voters did not know the definition of "serious
     felony offense," it is highly likely that many did not understand the scope of the law.  SOF

23   5, 6.  Under these circumstances, Proposition 100 should be subjected to heightened
     scrutiny under the Due Process Clause.  *Cf. Jones v. Bates*, 127 F.3d 839, 862-63 (9th Cir.

24   1997) (striking down state constitutional amendment passed by ballot initiative because
     voters were not provided with adequate notice that law would result in limitation on

25   fundamental right), *rev'd sub nom. Bates v. Jones*, 131 F.3d 843 (9th Cir. 1997) (reversing
     conclusion that voters were not adequately informed of effect of law but leaving standard

26   in place without deciding whether it was correct).

9

on illegal immigration." SOF 45.  Newspapers referred to Proposition 100 as a measure to "curb[ ] illegal immigration" and to address the federal government's failure to deal with the "problem" of illegal immigration.  SOF 46.  Such media reports can be considered as evidence of how the voters understood the referendum.  *See Valeria*, 307 F.3d at 1041 n.8; *Bates*, 131 F.3d at 846; *City of Los Angeles v. County of Kern*, 509 F. Supp. 2d 865, 876-80 (C.D. Cal. 2007).

## B. Proposition 100 Violates Due Process Because It Is Excessive in Relation to Any Legitimate Purpose for Pretrial Detention

Proposition 100 also fails under *Salerno*'s second-stage test.  The undisputed evidence demonstrates that Proposition 100 is "excessive in relation" to any legitimate regulatory purpose because the legislature (1) imposed a categorical prohibition on release regardless of whether an individual defendant would be found by a court to pose no flight risk or danger of re-offending; (2) made no findings to demonstrate that undocumented immigrants categorically pose a greater flight risk or danger of re-offending; and (3) arbitrarily applied Proposition 100 to a broad range of charged offenses including many relatively minor crimes.  Thus, to the extent proponents expressed any intent that Proposition 100 would address flight risk or the risk of re-offending while on bail, such assertions would not save Proposition 100.  "[T]he mere invocation of a legitimate purpose will not justify particular restrictions and conditions of confinement amounting to punishment." *Schall*, 467 U.S. at 269.

### 1. Proposition 100 Is Excessive in Relation to Any Legitimate Purpose Because It Imposes a Categorical Prohibition on Bail and Requires Courts To Ignore Factors of Flight Risk and Danger to the Community

Under Proposition 100, once the court determines that there is probable cause to believe a defendant has entered or remained in the United States unlawfully and that there is "proof evident or presumption great" that the defendant committed the charged offense, the court has no discretion to release the defendant under any circumstances, even if the

1  court would find that the defendant does not pose a flight risk or danger to the community.

2  *See* SOF 59 (Segura Decl. Ex. O (Rosell Dep. Ex. 6, Administrative Order No. 2007-30

3  (Ariz. S. Ct. Apr. 3, 2007))); SOF 11, 106.  It is undisputed that under Proposition 100,

4  many defendants who otherwise would be granted bail pursuant to an individualized

5  determination are held categorically ineligible.[5]  SOF 106, 109.  After the passage of

6  Proposition 100, many defendants who previously had been released on bail and who had

7  appeared for court without incident were remanded as ineligible for bond.  SOF 107.

8        The federal courts have not approved such extreme bail laws.  To the contrary,

9  courts have held that individualized assessments of flight risk or dangerousness are critical

10  to the constitutionality of pretrial detention statutes.  For example, in *Salerno*, the

11  Supreme Court approved a federal statute that provides for a presumption *in favor of*

12  release, and permits bail to denied only if the government proves by clear and convincing

13  evidence in a given case "that no condition or combination of conditions will reasonably

14  assure the appearance of the person as required and the safety of any other person and the

15  community."  481 U.S. at 742; 18 U.S.C. § 3142(e).  *Cf. also Schall*, 467 U.S at 263;

16  *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006).

17        Proposition 100 is unprecedented, both as a categorical *prohibition* as opposed to a

18  rebuttable presumption against bail, and in the broad range of offenses that it reaches.  *See*

19  Appendix A (summarizing bail statutes).  The few laws that impose categorical bail

20  prohibitions are far narrower than Proposition 100 in that they are (1) limited to the most

21  serious crimes, such as murder or rape, or crimes carrying a life or death sentences; and/or

22

23  _____

24        [5] Since the passage of Proposition 100, state courts have had occasion to consider
   the bailworthiness of defendants who are charged with both a Class 1-4 felony and a
25  lower level felony.  In such cases, courts have set bond on the lower level charge, thus
   indicating that they believe the defendant does not pose a flight risk or a danger to the
26  community, but are forced to hold the defendant nonbondable as a result of the higher
   level felony under Proposition 100.  SOF 112.

1    (2) only impose a rebuttable presumption in favor of detention; or (3) permit very short

2    periods of nonbondability to address specific and immediate risks.  *See* Appendix A.

3         States have limited categorical bail prohibitions to cases in which the charged

4    offense approximates those most heinous crimes that are traditionally punishable by death.

5    *See*, *e.g.*, *Scott v. Ryan*, 548 P.2d 235, 236 (Utah 1976) ("gravity of the nature of the

6    offense" when defendant is charged with a capital crime justifies ineligibility for bail).

7    Such provisions are based upon an assumption that persons facing the harshest penalties

8    pose a greater flight risk.[6]  *See*, *e.g.*, *Simpson v. Owens*, 85 P.3d 478, 486 (Ariz. Ct. App.

9    2004) (upholding no-bail law for sexual conduct with a child under 15 because statute is

10   limited to "most serious of crimes" and "crimes that involve inherent and continuing risks

11   if bail were granted").  Even in states with offense-based categorical bail prohibitions,

12   courts have often interpreted those laws to permit courts the discretion to set bail.  *See*,

13   *e.g.*, *State v. Arthur*, 390 So. 2d 717, 717 (Fla. 1980); *In re West*, 88 N.W. 88, 89-90 (N.D.

14   1901).  Proposition 100 is far more extreme than these narrow laws.  And indeed, the

15   legislature knew that no other state had passed a law remotely like Proposition 100, yet

16   failed to consider narrower alternatives.  SOF 48.  This is further proof that Proposition

17   100 is excessive in relation to any legitimate purpose.  *Cf. Schall*, 467 U.S at 268.

18        The only federal court to have addressed a bail statute even approaching

19   Proposition 100's draconian categorical prohibition struck the law down as being arbitrary

20   and excessive.   In *Hunt v. Roth*, the Eighth Circuit invalidated a Nebraska statute

21   prohibiting bail for defendants charged with "sexual offenses involving penetration by

22   force or against the will of the victim."  648 F.2d 1148, 1151 (8th Cir. 1981), *vacated as*

23   *moot sub nom. Murphy v. Hunt*, 455 U.S. 478 (1982) (vacating decision below as moot

24   _____

25        [6] Proposition 100 cases often fall into the opposite end of the spectrum, as many
26   accused persons subject to Proposition 100 eventually are sentenced to time served or
     non-custodial sentences.  SOF 108.

1   because defendant was no longer in pretrial detention).   *Hunt* rejected the state's

2   contention that the law was necessary to protect the community from danger, holding that

3   such a categorical presumption was a "fatal flaw" under the Due Process Clause because it

4   removed the court's consideration of "appropriate factors" and "reasoned judgment" as to

5   bail in the individual case.   *Id.* at 1164.   Although *Hunt* was vacated as moot by the

6   Supreme Court, the Eighth Circuit's analysis is sound.

7        Other courts have cited *Hunt* in invalidating bail laws far narrower than Proposition

8   100.   In *Augustus v. Roemer*, 771 F. Supp. 1458 (E.D. La. 1991), the district court

9   enjoined a state bail statute that levied surcharges on bonds.   *Augustus* held that "the

10  accused has a fundamental due process right to have his or her *eligibility* for bail decided

11  free from unreasonable individual determinations or arbitrary statutory classifications."

12  *Id.* at 1465 (emphasis added).   In *Huihui v. Shimoda*, 644 P.2d 968 (Haw. 1982), the

13  Hawaii Supreme Court struck down a statute prohibiting bail when the charged offense is

14  a "serious crime" and the defendant is already free on bail with another pending charge.

15  The court held that the legislature may not "determin[e] that an entire class of accused

16  persons is not entitled to bail by reason of their presumed dangerousness, without

17  affording these persons a fair opportunity to rebut such presumption."   *Id.* at 543.

18  Proposition 100, like these narrower statutes, denies bail based not on an individualized

19  assessment but rather on an "arbitrary state decree."   *See Hunt*, 648 F.2d at 1164.

20      **2.      Proposition 100 Is Excessive Because the Legislature Made No Findings
            to Demonstrate that It Was Needed To Address a Legitimate Purpose**

21

22      Proposition 100 is also excessive because it was enacted without a shred of

23  evidence that it was needed.   *Salerno* turned in part on the fact that Congress had

24  "narrowly focus[ed] on a particularly acute problem in which the Government interests

25  are overwhelming," and made specific legislative findings that individuals charged with

26  the enumerated "specific category of extremely serious offenses" were "far more likely to

13

1   be responsible for dangerous acts in the community after arrest." 481 U.S. at 750.  Those

2   legislative findings were based on statistical studies.  *Id.* (citing S. Rep. No. 98-225

3   (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3189 & nn.24-26).  Moreover, Congress

4   was careful to tailor the statute narrowly, merely permitting courts to consider

5   dangerousness as one factor in a particularly narrow class of cases, and with the

6   prosecution held to a very high standard of proof.  *Id.* at 3189.

7       In contrast, the Arizona legislature failed to make any findings about the need for

8   Proposition 100 and therefore could not even begin to tailor a statute to address an

9   identified problem.  Legislators neither presented nor sought out any evidence suggesting

10  that undocumented immigrants categorically pose a greater flight risk.  SOF 32-34, 26, 27.

11  When asked directly whether he had any evidence that foreign nationals pose more of a

12  flight risk than U.S. citizens, Proposition 100's sponsor simply stated that "one of the

13  elements of flight risk is the lack of knowing who you are and where you actually live and

14  lack of roots," without acknowledging counterarguments that some unauthorized

15  immigrants may be long-term Arizona residents and able to prove their identity and roots

16  in the local community.  SOF 24, 25.  Indeed, Pearce stated that the evidence did not

17  matter, opining that "[i]rrespective of any other data, illegal is illegal."  SOF 26.  Other

18  proponents made blanket statements that undocumented immigrants are an "absolute huge

19  flight risk" and that "[w]e can prove it statistically by looking at behavior before it was

20  put in place," but they cited no evidence.  SOF 27.  Such unsupported assertions do not

21  pass muster.  *See Sable Communications v. FCC*, 492 U.S. 115, 129-30 (1989).

22      Had the Arizona legislature taken any steps to look into the matter, they would

23  have found no evidence that undocumented immigrants needed to be singled out for a

24  categorical bail prohibition.[7]  Before Proposition 100, some criminal defendants who were

25  ───────────────

26      [7] Notably, the federal pretrial services agency's bail assessment tool does not
    include immigration status among the nine factors indicative of flight risk. SOF 28.

14

believed to be unlawfully in the United States and charged with a Class 1 through 4 felony were released because of their extensive local ties and other individualized factors, SOF 111, and subsequently made court appearances without incident, SOF 109.   And in Maricopa County, neither the Sheriff's Office nor the County Attorney's Office had any statistics showing that unauthorized immigrants were more likely to fail to appear or to commit a new offense while on pretrial release.  SOF 36, 37, 38, 39, 41.

But even if the legislature had made specific findings, Proposition 100 would still be excessive because the legislature never "actually considered and rejected the efficacy of less restrictive measures before adopting" it.  *See Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005).  In fact, it was entirely unnecessary to amend the Arizona bail statute at all, much less impose the extreme measure of a categorical ban on pretrial release.   Before Proposition 100, a court could already take immigration status into account in deciding whether to set bail.  SOF 49.  And courts had a variety of existing statutory mechanisms for ensuring a defendant's appearance, such as electronic monitoring and pretrial supervision.  A.R.S. § 13-3967.

In short, Proposition 100 was intended by its sponsor to be overly broad and to err on the side of detention.  Pearce expressly stated that the legislature "ought to . . . err[] on the side of holding people without bond if they're in this country illegally. . . .  That ought to be the standard."  SOF 30.  This directly contravenes the Due Process Clause.

### 3.      Proposition 100 Is Excessive Because It Applies in Cases with Admittedly Minor Charged Offenses

Proposition 100 also is excessive because it applies to a broad range of cases including relatively minor offenses for which there is no reason to believe that a particular flight risk inheres.  By its terms, Proposition 100's constitutional amendment applies the categorical prohibition to a defendant charged with a "serious felony offense."   Ariz. Const. art. II § 22(A)(4).  The implementing statute defines "serious felony offense" as a

Class 1 through 4 felony or aggravated DUI.  A.R.S. § 13-3961(A)(5)(b).  By that statutory definition, a criminal defendant who is charged with relatively minor and non-violent crimes, including shoplifting and vandalism, is categorically ineligible for pretrial release.  A.R.S. §§ 13-1602(B)(1)-(2), 13-1604(B)(1)(a)-(b), 13-1805(H)-(I).

The legislature made no findings to justify the definition of "serious felony offense" to include Class 1 through 4 felonies.  SOF 51.  And in defining "serious felony offense" for purposes of Proposition 100, the legislature ignored the existing statutory definition of "serious offense," SOF 53, which is limited to heinous crimes such as murder, aggravated assault, sexual assault of a minor, armed robbery, first degree burglary, and child prostitution, A.R.S. § 13-706(F)(1)(a)-(l).  The legislative proponent of Proposition 100's definition of "serious felony offense" did not even undertake to review which crimes would be included in the "hundreds and hundreds" of statutes included in Classes 1 through 4 before proposing that Proposition 100 should apply in all those cases.  SOF 58.  Indeed, Proposition 100's legislative sponsor admitted that the definition of "serious felony offense" was the product of political "compromise" and not careful tailoring.[8]  SOF 50.  Proponents passed the broad definition of "serious felony offense" in the face of strong but unanswered criticism that minor crimes would be included.  SOF 57.  The definition of "serious felony offenses" to cover four out of six classes of felonies in Arizona was entirely arbitrary and excessive.

---

[8] The record demonstrates that the Maricopa County Attorney's Office originally suggested that "serious felony offense" be defined as Class 1 through 3 felonies, SOF 54, but that the legislative sponsor added Class 4 felonies, SOF 8.  Former Maricopa County Attorney Thomas, a key proponent of Proposition 100, SOF 22, acknowledged that some Class 4 felonies are not serious, but suggested that the solution would be to re-classify those offenses, rather than narrowing Proposition 100's scope, SOF 55, 56.  The inclusion of Class 4 felonies had a huge impact, as the majority of Proposition 100 cases involve Class 4 felony charges, SOF 113, and many of those cases eventually end in a disposition on a lower charge that would not have been subject to Proposition 100 at all, SOF 114.

1

**C.      Proposition 100 Violates Due Process Because It Lacks Minimally**
**Adequate Procedural Protections as Required by *Salerno***

2

3      Finally, Proposition 100 violates due process because it deprives criminal

4   defendants of their core liberty interest without providing even minimally sufficient

5   procedural protections.  In *Salerno*, the Supreme Court upheld a far less extreme bail

6   statute because it provided "adequate procedural protections." *See Zadvydas v. Davis*, 533

7   U.S. 678, 690, 691 (describing *Salerno*, 481 U.S. at 746, 747, 750-52).  *Salerno* relied

8   upon the fact that determinations are made only after a "full-blown adversary hearing"

9   with the right to counsel and other safeguards.  481 U.S. at 742, 750.  None of these

10   procedural protections is effectively available to a defendant at an initial appearance in

11   Maricopa County.  To the contrary, the procedures are so deficient that there is a high risk

12   of an erroneous deprivation of liberty.

13      Under Proposition 100, the standard of proof for the determination whether a

14   defendant has "entered or remained in the United States illegally" is probable cause.  SOF

15   72, 60.  Legislators expressly intended that the probable cause standard would "err on the

16   side of holding people without bond" and therefore would cause many more accused

17   persons to be held without bail.[9]  SOF 30.  The probable cause standard for the finding on

18   immigration status is far less stringent than the clear and convincing evidence standard

19   approved in *Salerno*.  Moreover, it is ill-suited to determining immigration status, which is

20   a highly technical legal question of federal administrative law.  *See Padilla v. Kentucky*,

21   130 S. Ct. 1473, 1483 (2010).  The probable cause standard "'as the very name implies . .

22   . deal[s] with probabilities" and "factual and practical considerations . . . on which

23

_____

24      [9] Legislators were successful in this effort.  Prior to the amendment, commissioners
in Maricopa County had applied a "proof evident, presumption great" standard and found

25   that the prosecution failed to meet its burden of proof in 94% of cases where MCAO
asserted nonbondability.  SOF 104.  Since the enactment of the probable cause standard,

26   this figure is reversed; the prosecution now has virtually a 100% success rate.  SOF 105.

17

1    reasonable and prudent men, not legal technicians, act.'"  *Gerstein v. Pugh*, 420 U.S. 103,

2    121 (1975) (quoting *Brinegar v. United States*, 338 U.S. 160, 174-75 (1949)).

3         In addition, the practices implementing Proposition 100 in Maricopa County fall

4    far short of the robust procedures that were key to *Salerno*'s holding.  During the initial

5    appearance, commissioners rely exclusively on a determination by a Maricopa County

6    Sheriff's Office ("MCSO") deputy as to the defendant's immigration status.  SOF 84, 89.

7    Those assessments are exceedingly prone to error.  SOF 85-88.  At initial appearances in

8    Proposition 100 cases, under Maricopa County policy, indigent defendants (who comprise

9    the "vast majority" of defendants, SOF 76) are not provided with appointed counsel.  SOF

10   77.  This practice is inconsistent with *Salerno*'s approval of the federal bail statute based

11   upon the availability of counsel.  481 U.S. at 751 (citing 18 U.S.C. § 3142(f)).  As a result

12   of these procedural deficiencies, rather than carving a "carefully limited exception" to the

13   constitutional right to liberty as due process demands, *Salerno*, 481 U.S. at 755, Maricopa

14   County initial appearance courts currently adopt an MCSO deputy's assertion of

15   nonbondability in virtually *100%* of cases.  SOF 89.

16        Finally, Proposition 100 does not provide a meaningful right to appeal, which

17   *Salerno* held to be a critical due process safeguard, 481 U.S. at 751-52.  Although a

18   defendant held nonbondable at an initial appearance is entitled to an evidentiary hearing

19   (known as a *Simpson* or *Segura* hearing) within seven days, *Segura v. Cunanan*, 196 P.3d

20   831 (Ariz. Ct. App. 2008), criminal defendants are not advised of their right to the *Segura*

21   hearing at the initial appearance, SOF 96, are often not represented by counsel until four

22   weeks after their initial appearance, SOF 97, and therefore seldom request a hearing.

23   Motions for *Segura* hearings are routinely denied, SOF 99, and even when defendants

24   succeed in obtaining one, they are not even permitted to see the evidence against them.

25   SOF 101.  The outcome of *Segura* hearings demonstrates their procedural futility:

26   Between May and December 2009, not one defendant held nonbondable at an initial

18

appearance succeeded in obtaining bond at a *Simpson/Segura* hearing.   SOF 100.
Moreover, state courts at every stage of the bail proceedings fail to issue written findings
and rulings, SOF 102, 103, which undermines the ability to seek appellate review of an
adverse determination.

## II.    PROPOSITION 100 VIOLATES THE EIGHTH AMENDMENT'S EXCESSIVE BAIL CLAUSE

On the undisputed facts, the Proposition 100 laws also violate the Excessive Bail
Clause of the Eighth Amendment, which provides that setting bail "at a figure higher than
an amount reasonably calculated to fulfill [its] purpose is excessive . . . ."  *Stack v. Boyle*,
342 U.S. 1, 5 (1951) (internal quotation marks omitted).  *See also Salerno*, 481 U.S. at
754; *Galen v. County of Los Angeles*, 477 F.3d 652, 660 (9th Cir. 2007).  The Eighth
Amendment's prohibition against excessive bail is rooted in the most fundamental and
cherished rights of an accused person under the U.S. Constitution, including the
presumption of innocence.  *Stack*, 342 U.S. at 4.  The purpose of bail is to give an
"adequate assurance that [the defendant] will stand trial and submit to sentence if found
guilty."  *Id.*  Thus, "the fixing of bail for any individual defendant must be based upon
standards relevant to the purpose of assuring the presence of that defendant."  *Id.* at 5.
The Eighth Amendment permits a court to deny bail in an individual case, but does not
permit a legislature to enact an arbitrary categorical prohibition on bail.  *See United States
v. Moore*,  607 F. Supp. 489, 493 (N.D. Cal. 1985) (noting that while legislature has
power to designate bailable and nonbailable offenses, "the case law is clear that legislative
determinations regarding the right to bail cannot be arbitrary"); *Augustus v. Roemer*, 771
F. Supp. at 1465.  *Cf. United States v. Portes*, 786 F.2d 758, 766 (7th Cir. 1985).  For all
the reasons set forth above in Part I, Proposition 100 is an arbitrary categorical denial of
bail and therefore violates this core Eighth Amendment principle.

III.   **MARICOPA COUNTY'S POLICY TO PROHIBIT APPOINTED COUNSEL AT THE INITIAL APPEARANCE VIOLATES THE SIXTH AMENDMENT RIGHT TO COUNSEL**

Even if the Court rejects Plaintiffs' facial challenge, it should grant summary judgment on Plaintiffs' Sixth Amendment challenge to Maricopa County's policy of prohibiting appointed defense counsel at initial appearances in Proposition 100 cases ("Proposition 100 IAs").  Proposition 100 fundamentally changed the nature of initial appearances, making them more complex and triggering the need for counsel.  As one Arizona court noted, before Proposition 100, bail hearings were "relatively straight-forward" but afterwards, "the no-bail determination became more complicated." *Segura*, 196 P.3d at 236.  Thus, after Proposition 100 went into effect, Maricopa County's director of indigent defense services determined that counsel should be present at Proposition 100 IAs to counteract the potential for prejudice.  SOF 73.  After Proposition 100, MCAO also decided that prosecutors should participate in initial appearances.  SOF 79.  However, Maricopa County countermanded the decision of the indigent defense services agency that counsel was needed and prohibited appointed counsel at initial appearances, while prosecutors have continued to participate in them when warranted.  SOF 74, 75, 79, 80.

Maricopa County's policy requires criminal defendants to stand alone and face a trial-like confrontation in violation of the Sixth Amendment right to counsel.  Criminal defendants are "entitled to the presence of appointed counsel during any 'critical stage' of the [criminal] proceedings," defined by the Supreme Court as "proceedings between an individual and agents of the State[,] . . . whether formal or informal, . . . that amount to trial-like confrontations, at which counsel would help the accused in coping with legal problems or . . . meeting his adversary." *Rothgery v. Gillespie County*, 128 S.Ct. 2578, 2591-92 n.16 (2008) (internal quotation marks and citations omitted); *Brewer v. Williams*, 430 U.S. 387, 398 (1977); *United States v. Wade*, 388 U.S. 225, 226 (1967).  "[T]he essence of a 'critical stage' is not its formal resemblance to a trial, but the adversary

nature of the proceeding, combined with the possibility that a defendant will be prejudiced in some significant way by the absence of counsel." *United States v. Leonti*, 326 F.3d 1111, 1117 (9th Cir. 2003).  Specifically, the Ninth Circuit has held that a critical stage is any pretrial proceeding in which: (1) "skilled counsel would be useful in helping the accused understand the legal confrontation"; (2) the proceeding may test the merits of the case; or (3) an unrepresented defendant's "failure to pursue strategies or remedies" may result in "a loss of significant rights." *United States v. Bohn*, 890 F.2d 1079, 1080-81 (9th Cir. 1989) (quotation omitted); *Hovey v. Ayers,* 458 F.3d 892, 901 (9th Cir. 2006).  While "[t]he presence of any one of these factors may be sufficient to render a stage of the proceedings 'critical,'" *Id.* at 901 (emphasis added), all three factors are readily found in Proposition 100 IAs in Maricopa County.

### A. Proposition 100 IAs Are a Critical Stage Because They Entail A Substantial Risk of Prejudice Without Assistance of Counsel

Proposition 100 IAs fall squarely within the definition of both a proceeding commencing prosecution, triggering the "attachment" of the right to counsel, as well as of a "critical stage," demanding the assistance of counsel.  In Maricopa County, Defendants' policies have rendered the Proposition 100 IA quite different from initial appearances in non-Proposition 100 cases or in federal or state courts where defendants are merely advised of the charges against them.  Pursuant to Defendants' policy and practice, Maricopa County prosecuting attorneys may appear at Proposition 100 IAs to present evidence and arguments seeking to hold defendants ineligible for pretrial release.  SOF 79, 80.  Suspects also may be confronted at Proposition 100 IAs with MSCO deputies and officers who testify about their immigration status based on detailed immigration-related interrogations conducted without providing the accused with *Miranda* warnings.  SOF 61-66, 70, 71.  Additionally, judicial officers may directly ask the accused about his unlawful entry into or presence in the country.  SOF 83.  Such questions are potentially

incriminating, SOF 62, 91, and thus a far cry from the merely "routine" questioning approved in other circumstances.  *See*, *e.g.*, *United States v. Perez*, 776 F.2d 797, 800 (9th Cir. 1985), *overruled on other grounds by United States v. Cabaccang*, 332 F.3d 622, 634-35 (9th Cir. 2003).

In *Coleman v. Alabama*, the Supreme Court held that a proceeding bearing such characteristics is a critical stage at which defendants are entitled to appointed counsel under the Sixth Amendment.  399 U.S. 1, 10 (1970).  In *Coleman*, the Court examined whether defendants were entitled to counsel at a preliminary hearing where a court determined whether there was probable cause to charge the defendant and whether bail should be set.  The Court ruled that the preliminary hearing was a critical stage because the defendant was confronted by prosecuting counsel as well as by witnesses.  Despite the fact that "the accused [was] not required to advance any defenses," and Alabama law "bar[red] the admission of testimony given at a pre-trial proceeding where the accused did not have the benefit of . . . counsel," the Court nevertheless determined it was "[p]lain[] [that] the guiding hand of counsel at the preliminary hearing [was] essential to protect the indigent accused against an erroneous or improper prosecution." *Id.* at 8-9.  *See also Higazy v. Templeton*, 505 F.3d 161, 172 (2d Cir. 2007) The adversarial nature and risk of substantial prejudice to defendants inherent in Proposition 100 IAs are even greater than those at the preliminary hearing deemed a "critical stage" in *Coleman*, thereby compelling the same result here.

### B.    Defendants Need Counsel to Understand the Confrontational Nature of the Proposition 100 IA

Defendants require skilled counsel to understand that legal confrontation at Proposition 100 IAs because they are highly adversarial proceedings in which complex determinations are made, affecting their substantive rights. *See United States. v. Johnson*, 516 F. Supp. 696, 699 (E.D. Pa. 1981), *aff'd*, 709 F.2d 1496 (3d Cir. 1983); *Wade*, 388

U.S. at 229-233, 236.   Defendants at Proposition 100 IAs are confronted by the substantive and procedural complexities of a bail proceeding *unlike any other in our nation*.   It is highly unlikely that a defendant proceeding without counsel can comprehend the significance, mechanics, and consequences of the determinations whether the "proof is evident, or presumption great" that the accused committed the crime, together with whether the accused entered or remained in the United States unlawfully.   The former requires the government to make a heightened showing of "substantial" proof, *Simpson v. Owens*, 85 P.3d 478, 491 (Ariz. Ct. App. 2004), and the latter requires an examination as to past and present immigration status, which involves complex questions of federal immigration law.   *See Castro-O'Ryan v. INS*, 847 F.2d 1307, 1312 (9th Cir. 1987).   Either standard is independently difficult for a layperson to comprehend, and understanding them together is altogether beyond reach for a layperson.   Defendants are therefore entitled to the assistance of counsel at a Proposition 100 IA. *See Rothgery*, 128 S. Ct. at 2589 (right to counsel at proceedings in which "the defendant is 'faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law' that define his capacity and control his actual ability to defend himself against a formal accusation that he is a criminal").

### C.   The Proposition 100 Initial Appearance Is Also a Critical Stage Because It May Reach the Merits of the Case.

The Proposition 100 IA is also a critical stage because a defendant runs a substantial risk of self-incrimination not present in IAs in non-Proposition 100 cases.   It is undisputed that in many Proposition 100 cases, a defendant's statements about his immigration status at an initial appearance may be relevant to the elements of the charged offense.   SOF 67, 90-93.   Defendants in Proposition 100 IAs have in fact made ill-advised statements about immigration status and the merits of the case without counsel present to advise against it.   SOF 78.   In addition, a defendant's statements about his immigration status at an IA may

1   be used against him in a subsequent federal criminal prosecution for illegal entry or re-

2   entry.  SOF 94, 95, 62.

3        Courts have cautioned that such bail determinations involving complex issues and

4   procedures entail an inherent danger that the accused will speak to the merits and

5   incriminate himself.  *See United States v. Melanson*, 691 F.2d 579, 584 (1st Cir. 1981).

6   Under such circumstances, counsel is needed to counteract the high risk of self-

7   incrimination.  *See Bohn*, 890 F.2d at 1081; *Massiah v. United States*, 377 U.S. 201, 205

8   (1964); *Yohn v. Love*, 76 F.3d 508, 522 (3d Cir. 1996); *Johnson*, 516 F. Supp. at 699.

9        As in these cases where the right to counsel was held to apply, the circumstances of

10   a Proposition 100 IA are unprecedented and unusual, and create a substantial risk that a

11   defendant may unknowingly make incriminating statements in an attempt to exculpate

12   himself, even if he is not questioned directly.  Faced with a prosecuting attorney, an

13   adverse witness, and a judicial officer making substantive determinations that a layperson

14   can only understand as a serious criminal proceeding with serious consequences, a

15   defendant will very likely attempt to advocate on his own behalf and defend himself

16   against the allegations.   And given the novel immigration-related determination at the IA,

17   it is particularly foreseeable that a defendant, confused and alarmed to learn that he will be

18   jailed and that his immigration status is at issue, will likely feel compelled to explain that

19   "matters [are] different from what the government portrays," both as to his immigration

20   status and the alleged crime.  *Melanson*, 691 F.2d at 584.  Thus, events during the IA may

21   severely prejudice the ability to defend against the charges.  *Higazy*, 505 F.3d at 172-73;

22   *United States v. Abuhamra*, 389 F.3d 309, 323-24 (2d Cir. 2004).

23        Because Proposition 100 IA proceedings "elicit[] . . . evidence [and are] peculiarly

24   riddled with innumerable dangers and variable factors which might seriously, even

25   crucially, derogate from a fair trial," Maricopa County's policy and practice of denying

26   defense counsel cannot stand because it violates "[t]he plain wording of [the Sixth

24

1  Amendment] guarantee [that] encompasses counsel's assistance whenever necessary to

2  assure a meaningful 'defence.'"   *Wade*, 388 U.S. at 225, 228.   Without counsel, the

3  defendant is left at the mercy of the prosecution and its witnesses to catch any error and

4  seek to rectify it – a result that is antithetical to our nation's adversarial system and the

5  precise danger that the Sixth Amendment guards against.

6                                **CONCLUSION**

7          The Court should grant summary judgment for Plaintiffs and enjoin Proposition

8  100.   In the alternative, should the Court deny summary judgment on Plaintiffs' due

9  process and Eighth Amendment claims, the Court should at the least grant summary

10 judgment on Plaintiffs' Sixth Amendment claim and enjoin Defendant Maricopa County's

11 policy of refusing to provide indigent defense counsel at IAs in Proposition 100 cases.

12 Dated:  September 10, 2010          **ACLU FOUNDATION**
                                      **IMMIGRANTS' RIGHTS PROJECT**
13
                                      **MEXICAN AMERICAN LEGAL DEFENSE**
14                                    **AND EDUCATIONAL FUND**

15                                    **ACLU FOUNDATION OF ARIZONA**

16                                    **PERKINS COIE BROWN & BAIN P.A.**

17                                    **STEPTOE & JOHNSON LLP**

18
                                      By:    /s/ Cecillia D. Wang
19                                       Cecillia D. Wang (admitted *pro hac vice*)
                                         ACLU Foundation Immigrants' Rights Project
20                                       39 Drumm Street
                                         San Francisco, CA  94111
21                                       Telephone:  (415) 343-0775
                                         Facsimile:  (415) 395-0950
22                                       Email:  cwang@aclu.org

23                                    Attorneys for Plaintiffs
                                      ANGEL LOPEZ-VALENZUELA
24                                    ISAAC CASTRO-ARMENTA

25

26

1                                CERTIFICATE OF SERVICE

2              ☒       I hereby certify that on September 10, 2010, I electronically transmitted the

3     attached  document  to  the  Clerk's  Office  using  the  CM/ECF  System  for  filing  and

4     transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

5
                            Timothy James Casey
6                           Drew Metcalf
                            Schmitt Schneck Smyth & Herrod PC
7                           1221 E Osborn Rd
                            Ste 105
8                           Phoenix, AZ 85014-5540

9                           Bruce P. White
                            Maricopa County Attorney's Office
10                          Civil Division
                            Phoenix, Arizona  85004
11
                            Lee David Stein
12                          Steven J. Monde
                            Kevin B. Wein
13                          Perkins Coie Brown & Bain
                            2901 North Central Avenue
14                          Suite 2000
                            Phoenix, AZ 85012-2788
15
                            Gladys Limon
16                          MALDEF
                            634 S Spring St
17                          11th Floor
                            Los Angeles, CA 90014
18
                            Daniel Joseph Pochoda
19                          Anne Lai
                            ACLU
20                          3707 N. 7th Street, Suite 235
                            Phoenix, AZ 85014
21
                            David Jeremy Bodney
22                          Steptoe & Johnson LLP
                            Collier Ctr
23                          201 E Washington St
                            Ste 1600
24                          Phoenix, AZ 85004-2382

25

26


                                        26

1

Kevin B Wein
Perkins Coie Brown & Bain PA
2
PO Box 400
Phoenix, AZ 85001-0400
3

4

I declare under penalty of perjury that the above is true and correct.
5

6    Dated: September 10, 2010
San Francisco, California
7

8

/s/ Lorena Fernandez
9                                                          LORENA FERNANDEZ

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26